Thank you. Please be seated. We're now ready for argument in Booker v. Bard. Good morning, Your Honors, and may it please the Court, James Martin for the appellant, Bard. With the Court's permission, I'd like to reserve three minutes for rebuttal. You'll have to keep track of your own time, but you're certainly free to do that. Thank you. We've made three arguments for reversal, as the Court knows. The first, based on preemption of plaintiff's tort liability claims. The second, on the lack of sufficient clear and convincing evidence of deliberately indifferent conduct necessary to sustain punitive damages. And the third, because there is no duty of care under Georgia law on which the jury verdict can be based. With the Court's permission, I'd like to turn first to preemption. As the Court knows, this case involves the express preemption provision set forth in 21 U.S.C. Section 360K, and it involves IVC filter products that were reclassified from Class III to Class II after a regulatory evaluation that began in 1995 and continued for approximately five years until 2000. After that, with the FDA adopting rulemaking, the products could only be marketed, the devices subject to binding special controls. And the preemption issue in this case comes down to the question of whether or not those device-specific special controls relating to safety and effectiveness are entitled to preemptive effect under 360K. What are the device-specific controls, in your view? So there are three. Three guidance documents, correct? Yes. Two of them are not device-specific, are they? Well, two of them are made device-specific to IVC filters by the guidance documents, so while they do apply to more than just IVC filters, for purposes of this analysis, they are made device-specific by the federal regulation that sets forth. And both of them, of course, deal with safety and effectiveness. We have guidance documents which the agency says are not binding legal requirements, correct? There is an original text for the guidance documents that says that they are not binding, but that is not. . . If they are not binding, let's assume they are for the moment, how can they be device-specific requirements? So two points there, Your Honor. First, they are device-specific requirements by virtue of the mandatory way the products get from Class III to Class II. And the way that happens first under the statutory scheme is the FDA has to make a determination that the device can move from Class III to Class II because of assurances. The determination is based on whether it's substantially similar to another Class II device. No, it's actually where there are assurances of safety and effectiveness that are appropriate to clear the device to Class II. Because it is substantially similar, correct? No, it goes beyond that, Your Honor. It goes to an independent evaluation of the safety and effectiveness of the device. Assume that happens, and then we have a guidance document. And the guidance document says it's not a binding legal requirement. So I still have the difficulty of figuring out why something that on its face is not a binding legal requirement is a device-specific requirement. Requirement is the word I'm worried about. Right. Now, first of all, again, in terms of the guidance documents as applied to the IVC filters, they could not be cleared for marketing under Class II without being subject to the special controls that are set forth by the FDA in the guidance document. That comes from the statute and the regulations. The FDA treats these guidance documents and special controls as mandatory. It has said so. Where is that, and how can I find that in the record? We have cited multiple regulations from the FDA and from the Fed Reg that provide that language specifically, number one. With respect to regulations or with respect to the guidance documents? Guidance documents themselves. So could your client be sanctioned for not following the guidance document? Our client could not sell the filter or market it and could be sanctioned if it doesn't follow the guidance documents. The guidance documents carry the special controls that make the device have reasonable assurances of safety and effectiveness. Without that, the statute makes clear we'd have to have a Class III PMA process. And in addition, I might add that you can get this from the guidance document itself, from 64 Fed Reg 12774, from 64 Fed Reg 17138, and from 21 CFR Section 870.3375. Look also at the FDA's summary memo approving the filters at 3662-3671. Well, I'm looking at 3375, and it just says the special controls for this device are that it cites a guidance document. Right. What does the word special controls mean? So special controls are those parts of the FDA regulations incorporated in the guidance documents that are applicable to the device. They are mandatory to be included with the device in order for it to be marketed and sold as Class II. That's the statutory construct. I want to understand your position on this. So the FDA issues these special guidance documents, and then you discover at some later point, and I know you can test the facts, but just for purposes of this, that your device fails in a substantially larger percentage of times than your competitors. Under your view of the world, what's your obligation at that point? Under our view of the world, our obligation is to deal appropriately with the FDA as it relates to potential changes in labeling or the design of the device, but that doesn't change the preemption calculus. Well, that's my question. See, there can be expressed preemption of some things, but not of all things. I'm trying to figure out how your expressed preemption argument deals with failure to warn about things that happen after your device is approved as a Class II device. The reason that preemption applies here comes directly from the preemptive provision itself. It says that if a state torque duty is different from or in addition to the mandated requirements that come from the approval process, or here the clearance process, under 510K by virtue of the Safe Medical Devices Act, then preemption takes hold. And that's why... So let me be clear why I'm asking this question. Nobody's claiming that you had to do something extra to get approval to sell. What they're claiming is that after you got approval to sell, a bunch of facts arose. Yes. And therefore, my question is, if those other facts arose and there would be a duty under state law to warn somebody of those facts, how does that impose an additional requirement over and above those required to classify your device as a Class II device? So we have cited several cases that deal with this directly. McClellan, Sprint, Fidelis. In fact, this court's concurring opinion in the Stengel case, the Cupic case, also addresses this. And what they say is, in those circumstances, the state torque obligation would require something different and additional because it would require language in the warning that is not the approved or cleared language by the FDA. And at that point, the preemption analysis takes over. And in fact, the preemption analysis is intended to cover the post situation because that's the precise time that preemption is needed the most. And so you don't have a situation where the expressed language of the statute is inapplicable. In fact, you have a situation where it matters the most. And here, there's no debate that the state would obligate comparative language in this warning that was not cleared by the FDA. And the FDA specifically cleared the warning language in the guidance document. So that gets back to my previous question. I take it your view of the law is that, under those circumstances, you would have an obligation to report this information to the FDA? Yes, and we did. And the FDA's failure to change the warning doesn't impose liability on you? It doesn't affect the preemption analysis. That's correct. Now, one step further on the language about non-binding guidance. That can't hold up against the changes in the regulatory process 2510K that were achieved through the passage of the Safe Medical Devices Act, on the one hand, and the guidance documents themselves, on the other. The Safe Medical Devices Act created a situation in which manufacturers had to supply data and testing information, the design of their product, the labeling, all of that information to the FDA for vetting under the 510K clearance process to provide reasonable assurances, and this is important here, of safety and effectiveness. So does the 510K regulation have information in it about providing subsequent failure rates to the FDA? It does not apply to that specifically. What it talks about is what has to be submitted to get clearance in the first instance. No, I understand that. I'm trying to find that there's something in the FDA's regulations or the statutory scheme that requires you to, that deals with subsequent deficiencies in the product found after approval. Yes. So we are required to report those to the FDA, and we did. Where? Where does it say that? In the regulations. That's part of the regulatory overlay of the Class II devices, and it exists by virtue of, I think it's 21 CFR Section 860.7, I think, or one of its subparts. But back to the point on there being mandatory, Your Honor, the FDA imposes these requirements on the devices and then authorizes them to be sold as safe and effective. There is no way in the world the FDA is going to take the position that those guidance documents are simply advisory and non-binding and can be followed only at the discretion of the manufacturer, because otherwise the very guarantee delivered by the statutory scheme would be undone. You're down to a little over two minutes, if you want to save rebuttal time. I'd like to make one comment about punitive damages, if I could, Your Honors, and that is that this product in this case was non-defective. It was sold pursuant to an FDA-cleared process with appropriate warnings, and there is no evidence in this record that relates to the kind of deliberate indifference in the cases. Well, see, now, and I hate to use your time, but you decided to go there, so let me pose a contrary world to you. You've got a product that you know fails significantly more than your competitors. Let's assume there's no preemption, because we don't get to this unless there's no preemption, and there is a duty to warn, and you do nothing to tell the doctors who are implanting this product that it has substantially higher error rates than comparable products. You know that, and you do nothing. So the product itself may not be legally defective. It just may be the worst IVC product on the market. At some point, don't you have the obligation to tell doctors that? So, Your Honors, there is the question of how this relates to the punitive damage inquiry. Let me finish. I'm talking about duty to warn. I'm not talking about a defective product, because the jury found that your product wasn't defective. If you do have a duty under Georgia law to warn, and you know of all these facts, but consciously choose not to give them to the doctors who are making decisions about whether to implant this, why isn't that enough for punitive damages? So it's an error in judgment, Your Honor, but unless you find the kind of deliberate indifference where profits are preferred over safety and there is a serious risk of injury that the manufacturer is concealing. Here, BART investigated. It did not do nothing. It reported the information to the FDA. It went beyond that and looked at the data itself, and what it determined was there were no serious risks of injury. There were no deaths. Even the plaintiff's expert conceded this information was largely asymptomatic. So BART followed through, changed the design of its device, but we don't get. And those are the facts in the light most favorable to your client. Those are the. But my difficulty is what you do know is that the migration and fracture rate of your device is substantially higher than those of your competitors, correct? Our preliminary data in the investigation revealed a higher rate than BART expected by its own internal standards. And higher than those of your competitors' devices, yes. But still well within industry norms, as reported to the FDA. And you know that information and you don't tell anybody in the chain of distribution about it, assuming no preemption. I understand if there's preemption, you've done your job by getting it to the FDA. Because what the risk information revealed, and it's undisputed, is of asymptomatic conditions that were not causing serious injuries. They were a rate of complication within industry norms, and so the decision not to identify or let physicians know in those circumstances is at best an error in judgment. But it's not deliberate indifference preferring profits over safety, and there is no equation to be made between that fact pattern and the fact pattern in the cases where that finding is made. Thank you, Counselor. You've exceeded a lot of time, but we'll give you a minute for it. Thank you. But a lot of time comes. Please. Thank you, Your Honors. David Frederick for Ms. Booker. The judgment should be affirmed, and I'd like to explain first what are the core questions in the preemption issue, because I think it will help simplify your analysis in what is a relatively complicated regulatory scheme. There are three basic questions that you have to answer. The first is, does the FDA guidance have the force of law? The second question is, does the FDA guidance apply specifically to the particular device? And the third question is, does the FDA guidance apply to the specific risk that the plaintiffs sustained or suffered from? Now, going back through each of those questions, the answer is no, and because the answer is no, under a well-settled law, the claims cannot be preempted. Can I simplify this from my perspective and see if you can help me? In order to market this device, these folks have to go to the FDA, correct? Yes. And the FDA says in order to sell this device, you must put a warning on it that warns of possible complications, correct? Generally, that is right, although subject to the duty of the manufacturer to keep its label up to date in years where this is actually quite important. No one can resist embellishing the answer to the question, so I don't blame you particularly for it, but the answer is the FDA says before you can sell this product, you must put a warning on it. Yes. Yes? Yes. Okay. I know you'll give me my opportunity to explain. Take me down the road. I understand you have counterarguments on the way. I'm just asking about facts. They put the warning that the FDA says they must put on the product on the product. It's different for a Class II than a Class III, and that's where I... I understand the legal arguments are different. I want you to get to the end of my string here, and you can tell me why they're different, but you do not contest that they put the warning that the FDA says to put on the product on the product. That is generally right. However, what the FDA says is that for Class II products that are subject to the 510K equivalents, the manufacturer is charged with keeping its label up to date. I understand you've said that now three times. And it does not have to get FDA approval to do that label change. Okay. I understand that, and, you know, we're just... Please go to the... Sorry. You can tell me on the last point why my reasoning is not good, but just tell me if I'm wrong on the facts. The FDA says to them you must put a certain label on the product, and they do. You say that doesn't mean that they shouldn't do a better label. I understand that. But at least the label that they put on the product was the one the FDA told them they had to put on the product, correct? Not exactly, because here this product was put in five years after the labeling information that you're talking about. And that's why the labeling here is really the charge of the manufacturer. The guidance that they point to, their most specific guidance, predates this product going on the market by six years. Was there new guidance in the interim? There was no new guidance in the interim. The last guidance... Look, I'm not unsympathetic to your argument. You may win on it, but you can't fight me on the facts. So just let me finish the facts. I'm sorry, Your Honor. And then you can tell me why those facts aren't relevant. I think you've tried to at each step along the way. They have to go to the FDA before they can market this product. You say yes, correct? Yes. Okay. Second, the FDA says before you market it, you must put a certain warning on it that deals with certain complications, correct? Generally so, yes. Okay. And in this case, specifically so? Generally so. Okay. So why isn't... Now you can answer the question with all the stuff you've been saving up. Why isn't a state law requirement that you say more something that's in addition to the FDA scheme and therefore preemptive? Because unlike Papike, this court's case, where there was a notice and comment rulemaking imposing specific warning language in a notice and comment rule that had the force of law, there is no such thing in this case. The three guidance documents that they point to all on their face say they are not binding on the public or the FDA. And in fact, and this is what's so important, Your Honor, they specifically say if the manufacturer has an alternate way of accomplishing the similar thing, the manufacturer is free to do whatever that alternate thing is. And so unlike cases where we have specific warning language that the FDA has approved in a rule of law, a rulemaking rule of law with binding force, we don't have that here. Could the FDA, if they went to sell the product, with the warning language in the guidance say, no, you can't sell it? Again, it depends if they are doing a Class 3 device. Class 2. Class 2, I don't believe that they can. I think all that they can do is to pass through the substantial equivalency review process. So let's assume a manufacturer doesn't put any warning language on its Class 2 device, notwithstanding the guidance. Could the FDA stop them from selling it? I'm not sure that the FDA could do that in this particular regulatory regime. Counsel, I'm sorry. I thought you would finish. Please. I'd like to ask you before you run totally out of time about punitive damages because that is an area of concern for me. There's much made of the difference between the complication rate of this manufacturer and the complication rate of its competitors. But what is Georgia law on the question whether you have to talk about your competitors as distinct from yourself? That is, let's say I sell a sugary drink. That's going to potentially cause cavities, and my sugary drink has much more sugar than another brand. In addition to saying this is sugary and it could cause cavities, do I have to say it's twice as sugary as Judge Hurwitz's brand? The standard under Georgia law, and this is set forth in the statute that we have cited and the district court cited, has a series of things from malice to conscious indifference. So the statutory question is, does the manufacturer's conduct rise to a level of conscious indifference? So my question is, how does that construct fit with the idea of having to say not only what your own problems are but how they relate to everybody else's problems? Well, there are two distinct questions, I think, Your Honor, here. One is, has the company placed profit above its own? That's a nice generalization. It doesn't answer my question, though. Let me give you a document that does answer your question, and this document was in the record. It is Special Excerpt of Record 4, and what it says is that Comp Bar did put profits ahead of safety and that the users of IVC filters, quote, can be swayed by aggressive marketing even in the absence of solid clinical history and in spite of documented negative clinical experiences. That does go to putting profits above safety. I think the question Judge Graber is asking is a different one. I hope it is, as I understand it. The question is, what's your duty under Georgia law when your product is not as good as your competitors but falls within? We have a complication rate in these cases of less than 1% in most cases. So what's your argument in this case is not that you should tell us that these products generally are unsafe. Your argument is you should have told us that yours is not working as well as those of your competitors. So what's the duty under Georgia law? There are two different questions, Judge Graber, and I'm trying to get this correct. And the question is a failure to warn question. I understand that, but what does the warning have to say under Georgia law? The warning has to provide an adequate risk information so that the practitioner is aware of the risks subjecting the person to. Okay, were they not told that fracture migration were a risk? They were told that it was a risk. Okay, that's my problem. They were told that it's a risk, but where in Georgia law does it say you have to not only say you have a risk of, in my example, cavities, in this example, fracture and migration, but then you also have to go on and say, and my product isn't as good as my competitor's product. It is a general tort duty, and a general tort duty provides that if the warning is inadequate for the risk, the risk here was that by using one device versus another device, Ms. Booker faced significantly higher risk. Well, that's an issue for me, too, is the significantly, because it's one thing to say something is a 5% risk versus a 30% risk, where there's a big, big risk, and these risks are all very tiny. So you're talking about very tiny and even tinier, and that concerns me as well, because the relative percentages matter to some extent, but so does the absolute number. The doctor here testified, and this testimony is in the record and was credited by Judge Campbell, that had he known of the information that there was a three to four times greater risk of these sorts of fragmentations and migrations, he would not have used this device on Ms. Booker. Is there a difference in a case like this that we're dealing with learned intermediaries? I don't think so, because— I think it helps you, so don't be so quick to answer it. If I told the public you're one half a percent more likely to get fat by drinking my soda than Judge Graber's, it might be immaterial, but if I tell doctors who are evaluating risks for their patients who have reasonable alternatives, it might well be material. So to me, what makes the nondisclosure more troublesome is that it's nondisclosure to learned intermediaries who are themselves evaluating the risks for their patients. I'd be—so I'm not sure you want to give the answer that it doesn't make a difference. To me, it might well make a difference. For the articulation of the general duty, it doesn't make a difference. To the application of that duty in a trial where the evidence comes forward, it does make a difference. That's all I was trying to say. Well, see, because this is a duty to the general public, and your error rate, the error rate of BARD is, say, 0.9%, and the error rate of one of its competitors is 0.5%. I'm not sure that I could easily call that material, but to a doctor who has reasonable alternatives and is making decisions, I think that might well be a material. I'll accept your point, and if that satisfies you, Judge Graber, as that is the way Georgia law operates, and as the evidence and the properly instructed jury here were found, that that would have made a significant difference to the doctor who inserted this device on Ms. Booker, and he would not have put this device in her body had he known of the significant additional increase in risk from this device to another. That doesn't get me all the way to punitive damages, though, because it seems to me that that could easily be a judgment call that is made, not to go into detail about what your competitors are doing. I just have difficulty seeing that as the sort of outrageous conduct that Georgia law seems to impose from some of the cases that don't uphold punitive damages for various kinds of problems. Well, point one, there was no argument by Bard about the instructions, so you have a properly instructed jury on punitives. You're evaluating this simply on a sufficiency of evidence challenge. Correct. And you had a judge who, in a post-trial motion, went through the evidence and explained why he believed the jury. And we have to review that. I think the world of the district judge, but what he did has no binding effect on us. And then the third point is that some of these documents made very clear Bard knew about the risks and did not disclose these risks, and the judge reasonably— That's where I lose track, because it seems to me that they did disclose the risks. They didn't disclose the comparative wonderfulness of their product versus other people's products, and that seems very different to me. If they had never said this could migrate, that seems like a completely different ballpark to me. Well, we're talking about, just so we're clear about the risks here, we're talking about the shearing off of a point that is essentially like a double-pointed sphere. I know what we're talking about. They did warn that these things could migrate or fracture. Those were stated risks. And there's, to me, not a very subtle difference between failing to warn at all and warning but doing so just generically, saying this is a risk of our product without explaining how other people's products work. Those are very different in my mind. And in the trial record, Bard did not contest the evidence that its document showed that it thought this was a $172 million market, that it was seeking to maximize its market share notwithstanding those risks. And that kind of evidence of putting profit above safety, where there is a comparative product that doesn't have the same kind of safety risk, is exactly what a punitive damages award is entitled to be given. And I would note that we're not talking here about any constitutional standards. This was a punitive damages award that barely exceeded a one-to-one ratio of the actual harm. I understand that. And so in those circumstances, we ask that this punitive damages be upheld because Bard did not inform the doctors of the risk and it did nothing to correct the inaccurate representation that it had, quote, an enhanced fracture resistance. This is its special excerpt of Record 105. When it made that representation of that enhanced fracture resistance, what year was that? I don't recall. Wasn't that in 2010? Wasn't that after this device was implanted? I don't recall that. But the point is that it was before her injury. It was before the implantation that they made that representation? I don't recall. Okay, I'm not sure you do. I don't recall. Counsel, you've exceeded your time, and I think we understand your arguments. Thank you, Your Honor. Thank you. And I believe we gave you a minute for rebuttal. Mr. Martin. Yes. So as to the controls being device-specific, please look at 64 FEDREG12774, 64 FEDREG12776, and 65 FEDREG17138. The guidance document, as I said, is at ER4637, and following to 47, it's device-specific. And finally, the FDA approval memo that I mentioned at 3662-71. Don't take my word for the mandatory nature of this. Look at what the FDA has said about it, and 75 FEDREG31026, 78 FEDREG79310, 80 FEDREG30154. All of those indicate these are mandatory, and lower indicates that deference should be given to that. Lastly, the evidence that was mentioned on punitive damages, the Hudnall memo at SER2-12 is a description of marketing conditions, not about the product, and it's about a different product. It's not about the G2. Thank you. The case just argued is submitted, and once again, we appreciate helpful arguments from both of you.
judges: Graber, Hurwitz, Miller